Mr. Aylward, are you prepared to proceed? I am. May it please the court, counsel, good morning, your honors. Good morning. We are here because two weeks after Mr. Aguirre's trial, Mark Schliffka, the man who prosecuted Mr. Aguirre, contacted JAN, the complaining witness in Aguirre's case, in pursuit of a romantic relationship. May I ask, and excuse me for interrupting you right off the bat, is that established in the record by the petition for the OP that was filed by the victim in the domestic violence? Yes, your honor, so it was established by both Mr. Aguirre's filings and also the state's response to the motion for a new trial. There was the emergency order of protection which was filed by JAN with the court. The state also provided an affidavit in response, and that establishes that two weeks after trial, Mark Schliffka contacted JAN in pursuit of a romantic relationship. Two weeks after trial? Two weeks after trial, yes. Your theory is that he had his eye on her during the trial, and he was basically pushing to get a conviction because he intended to pursue her later on, right? Absolutely, your honor. Was there any proof of that? I mean, it's a theory, speculation. I was a prosecutor for 30 years, and we never had anything like that in my office, but we all know that the relationships do exist, and they do happen. Sure, but where's... The point is, where's the prejudice? So, um, so... Proven prejudice. Right, so... Speculation. Right, so we can't, so, right, Mr. Aguirre, you know, can't, you know, how can he show prejudice? How can he get it unlearned in Mark Schliffka? And the consequences for Mr. Schliffka were pretty severe. He was fired, and there was ARPC action against him. I believe he was suspended, correct? Yes, they recommended a three-year suspension. So it was a pretty heavy price. Yes, now, Mr. Aguirre also paid a heavy price for his first felony conviction, and... The facts supported the conviction. Now, but we don't know how that trial would have gone if there wasn't a prosecutor who was looking to pursue the complaining witness immediately after trial. Can you think of anything that he did during the trial that would have caused the outcome to be different just because of a potential relationship? So how can we know, how can we get into Mark Schliffka's mind to know exactly how he prosecuted that case? I mean, if you look at the evidence from trial, J.N. gave different statements. We don't know exactly, you know, if the office would have even pursued this case. We don't know how he would have approached different aspects of it. Let me ask you this, though. There are different types of conflicts. There's a per se conflict, and then there's an actual conflict. Tell us how you want to proceed or how you're proceeding on this. So this isn't about a conflict of interest. I'm not arguing that it was an actual conflict of interest or a per se conflict of interest. I'm arguing that Mr. Aguirre's conviction basically fails to instill confidence in our administration of justice. We can't have prosecutors immediately after trial pursuing and complaining witnesses that they didn't meet until that trial. That, sorry, go ahead. Well, excuse me again, but why doesn't the rule requiring prejudice for a new trial, why doesn't that serve here? If that would be one question, lest I interrupt you again. Sure. What would be the, what would constrain the rule you're proposing? Well, so the issue establishing prejudice is that Mr. Aguirre, as the defendant, he is unable to know exactly how Mr. Schliff's actions were impacted by his desire to pursue Jeanne. And so this is about preserving the integrity of our criminal courts to ensure that, you know, prosecutors aren't using their position to essentially pursue people and then try to convict people and have them put away so that they can then pursue a romantic or sexual relationship. It's just, it's a position where Mr. Aguirre can't, he can't say he didn't ask this question or present this evidence. Yes, and I can understand that because this didn't come out through no fault of the defendant until long after not a situation of his making, choosing, he had nothing to do with that. So I'm sensitive to that concern. But on the other hand, when there's an error that somebody complains about in new trial motion, you still have to show prejudice and there is some element of speculation, if you will, about how did this alleged error impact, how much, was it significant? Why wouldn't that serve him? It doesn't serve because there's truly no way for a defendant to ever know. So it essentially would allow a prosecutor the day after trial to start pursuing a complaining witness before his conviction was even final. The motion for a new trial hadn't even happened yet. And in the record, it was a very contentious motion for a new trial. There was a debate about what was said on the video. Shliska even, during that hearing, falsely claimed or falsely argued that Aguirre had waived certain arguments. He also incorrectly asserted that Aguirre played the wrong recorded statement, even though if you look at the motion for a new trial transcript and the trial, it was the exact same portion. It was an incredibly close case. And at that hearing, Mr. Shliska was already involved in a sexual relationship with J.N. Now, at the- It certainly violates the spirit of the rule. Yes. And so at the end of the day, what we need to ensure is that the public has confidence in our criminal justice system. And, you know, we can't allow a prosecutor, you know, mere weeks and days after trial to be, you know, pursuing a person that he didn't know beforehand in a romantic and sexual relationship. It would have been perfectly fine if he had waited until after the sentencing and post-judgment motion. No, I don't think so. I just think it makes it worse. Why is that? Because, I mean, lawyers- Lawyers all the time meet potential wives and husbands as a result of their relationships, but they wait until after everything is over before they begin any type of sexual affair. Well, luckily that's not the situation here. How many of you know who married a former client? None. You don't know a single one? No. What's the rule you propose? What would the rule be? Well, I think, right, it's going to be a fact by fact. It depends on the specific circumstances of the case. And at the very least, the line should be drawn at a motion for a new trial. Obviously, it would depend on the full record, just like every single, just like any other case, right? It depends on the exact kind of- So is there something like, and again, I don't mean to put words in your mouth, but where the facts support the court's conclusion that the public confidence in the judicial system might be undermined, then, in that case, the defendant need not show prejudice. Or do you, you don't even think about prejudice? I don't think there's a way to really find, to have the determination be based on prejudice, because we can't know how this prosecution is changed. But is the circumstance then, according to your telling, that that's the case where the court's concerned that the public might lose confidence in the judicial system? Yes. Is that it? You say it how you want, not how I want. Yeah, so I think, right, I think we need to assess this case on its facts. And what we need to focus on is that Mr. Aguirre waited two weeks after trial to pursue a sexual relationship. They then started a sexual relationship before the motion for a new trial was heard. And in that scenario, the public confidence in his conviction and in our criminal justice system would be weakened if it is affirmed. I should also note. So what is our standard of review? I mean, you're asking us to overturn a trial court's factual findings. Yes, so the standard of review is on abuse of discretion. I think that the trial court abused its discretion by finding that Mr. Aguirre's trial wasn't tainted by Mark Schlipka immediately pursuing J.N. after trial. And I think he, I think it erred in doing so. And I think that's shown by the fact that the motion for a new trial, he was representing, or he was dating J.N. I should also note when they moved for a new trial after finding out these allegations and also for a new sentencing, the state agreed to a new sentencing. But they didn't say it was because there was some sort of prejudice. They actually agreed it was just because there was an appearance of impropriety. They technically quoted Hamlet, but that was the gist of the statement was. It was like, we don't know exactly how it was prejudiced because you can't really know how Schlipka's argument was changed. And again, in that same scenario, it would be an abuse of discretion in sentencing. And so again, it's about that appearance of impropriety, which was argued below. And right here, with two weeks afterwards, there is an appearance of impropriety that Mr. Aguirre's conviction was impacted by Mr. Schlipka's later pursuit of J.N. What, how does People-Axwell-Hutchinson v. Hickman help your case? So that one highlights, right, how essentially his prosecution. So in that case, right, he prosecuted a murderer and then he represented a decedent's wife. And so it showed that his prosecution then later, you know, clearly influenced him prosecuting that person, was influenced by essentially the pursuit of being hired later. But the case involved a disbarment proceeding. Sure. Yeah. Not a criminal case. Right. But I think what it is, and so there were no criminal cases on point, luckily. It was a criminal case and then he filed a civil suit. Right. And so, yeah. After the judgment. Yeah. In other words, there were no sanctions. Right. And so the procedural posture was in the, was for, regarding his status as an attorney. But it highlighted, right, this idea that the state has been arguing, like, that it wasn't impacted, right. It didn't impact his trial. But this shows that there is clearly a strong implication that by making the action immediately after trial, that, you know, he was most likely impacted at trial based on this later action. The valid you acquired. Right. At trial. And so that's kind of how I was, yeah, that's what I used it for. The rules of professional conduct, I mean, Justice Mullins asked him how would you handle this rule that you were talking about. Do you think that the rules of professional conduct would aid you in some of the wording of where you're going here? I mean, there is 1.8 which says that sexual relationship with a client is prohibited unless predates the attorney-client relationship. It doesn't, it does predate here, but your position is it doesn't predate the motion for a new trial. Well, so you're right. So their relationship predates the motion for a new trial. And also, right, I think 1.8J is instructive. I mean, it is tough because it's, you know, that is talking about clients and, you know, here there's a complaining witness. It's a slightly different kind of scenario. But it does highlight kind of the impropriety of it and kind of what. The Victim's Rights Amendment and the Victim Rights Statute provides that prosecutors and the state, prosecutors, police officers, everybody in the system are to treat victims with dignity and respect throughout the criminal justice process. Pursuing a sexual relationship is not consistent with dignity and respect, right? I agree with you, Your Honor, yes. Yeah, and so I think that, you're right. And so that is another reason why Mr. Schliff's behavior after trial was inappropriate and, you know, really, you know, weakens the confidence our public has in this conviction. You know, did he have a conflict of interest? So that is not what I'm arguing here because of how the conflict, you know, because of how that's structured. I don't think it clearly fits in within like a per se or because it wasn't contemporaneous under Yoast. It's very specific. It has to be contemporaneous. But there are rules of professional conduct that talk about conflicts of interest, correct? Yes, yes. And so, you know, there is, right, that aspect of it. And, you know, right? And so, yeah. And so here I do think, though, right, it does, that does impact it. It does kind of highlight the impropriety of Mr. Schliff's actions and how it, you know, impacted Mr. Aguirre's trial. Because we just don't know exactly how a prosecutor would have treated that trial if they weren't going to pursue J.N. immediately afterwards. Your time is up. Justice Mullen, any questions? Justice Perpet? No, that's all. Let me sum up real quickly. Yes. But you will have an opportunity for response. This court should grant Mr. Aguirre a new trial because Mr. Schliff's actions pursuing J.N. immediately after trial tainted his conviction and calls into question the fair administration of justice in this case. Thank you. Thank you. Ms. Moore. Good morning, Justices. Good morning. May it please the Court. My name is Gabrielle Moore and I represent the people of the State of Illinois. This case is about whether criminal convictions should be overturned based on what prosecutors might have been thinking or based on what actually happened at trial. The issue that is before you today is that the trial court abused its discretion in denying defendants motion for a new trial where the evidence showed that there was no relationship between the ASA, Mark Schliffka, and the complaining witness prior or during the trial. And the answer is no. The controlling standard here was addressed in People v. Pickett where it says the motion for a new trial requires abusive discretion analysis. And it must be shown, actual prejudice to the defendant's right to a fair trial must be shown. And that takes us to the circuit court's finding at the motion for a new trial and the alternative, the motion for a new sentencing hearing. At that hearing, the trial court made a factual finding that there was no evidence that showed that there was a relationship between the ASA and the witness prior to the trial or during the trial. How about prior to the motion, the post-trial motions? So the ASA made contact with the witness two weeks after the trial. Was that prior to the post-trial motion? Yes. It was after the trial, before sentencing, prior to the post-trial motions. And the ASA reached out through a social media site. That's how he made initial contact. J.N. sued Mr. Schliffka after the proceedings, correct? Yes, Your Honor. Yes, Your Honor. And that case ended up being decided on summary judgment or a motion to dismiss, I think. I believe it was a motion to dismiss. My question to counsel was whether or not Mr. Schliffka's behavior and its potential effect on the trial violated the Victim Witness Bill of Rights, which provides that crime victims ought to be treated with fairness and respect for their dignity and privacy throughout the criminal justice system. Did his behavior violate that principle? He pursued a sexual relationship with a crime victim. Yes, Justice Parker, he did pursue a relationship two weeks after the trial when he made initial contact, which was March 30th, to be more specific, of 2022. And that relationship established during the trial and pre-trial proceedings with her is what led him to pursue her. I don't believe that that – He was the first assistant. He was not just some lying assistant state's attorney. He was the first assistant state's attorney. Yes, Your Honor. He was the first assistant state's attorney. But the evidence shows that there was no pre-existing – outside of a professional relationship prior to the first contact that was made two weeks after trial. And what we are dealing with here is whether his conduct during the trial prejudice the defendant in any way. And I believe, as was mentioned earlier, the human nature argument that someone might be inclined to adjust, you know, their behavior or conduct before pursuing someone. I believe that that's purely speculative. And there is no evidence to – the integrity of the criminal justice system that the defendant need not show prejudice, that because of that type of behavior, we must reverse the case and send it back for a new trial, because it so undermines confidence in the system. I don't believe that that's what we are dealing with in this particular case. I don't understand what you are highlighting, Justice Parkett. When he began to pursue her, just standing alone, is that a conflict of interest? I'm sorry. Can you repeat the beginning part? I didn't hear. When he began to pursue her, which you say, okay, nothing happened until two weeks before, is that a conflict of interest? Did he have a conflict, then, between his duties to his office, the court, the law? As far as the record establishes, it's a – Let's assume we are just past the point when he pursues her over social media. Are you with me? Yes. At that point, does he have a conflict of interest? Possibly. There was a conflict of interest. That could have been at that time. Can I ask you, then, at what point is it more than possible? At what point are you sure? Is it the point when – At what point? Does he never have – is it always just a possible conflict when he is, one, pursuing and or engaging in a relationship with the victim? Is there a point when, for sure, it's a conflict and more than just a potential conflict? I'm sure it is. But in this case, when we made contact on March 30th, that was through social media, at some point by April, they had some form of a relationship. And when was that? The post-trial motion. You said that was the post-trial? The first post-trial – the first new trial motion. When was the first new trial motion? That's the one that happened. I think the initial one was in May, May 2022. So, like, he made contact March 30th, 2022. So, then, would it be fair to assume they were engaging in a relationship at that point? Does that make a fair assumption? I don't believe it's a fair assumption based on the evidence that's presented. And that's the only way I'm trying to learn it, in the sense of the evidence doesn't show, like, that there was, for sure, a full-blown relationship that occurred by the time the first new trial motion was filed. But to address your concern about the – Wait, say that again? You were speaking quickly, and I'm not sure I fully understood you. The evidence that was submitted via the affidavit and things like that, it doesn't support that there was, like, a 100 percent full-blown relationship by the time – 100 percent meaning what? Like, fully sexual and carrying out, you know, fully carrying out by the May – I believe it was the May 14th motion for a new trial. Are you trying to say that there could be a conflict, but with the conflict, you must show prejudice? In order – in this case, in order to – for a motion to – for a motion for a new trial to be granted, prejudice must be shown. That is what I am arguing. In this case, prejudice has not been shown by the defendant. The human nature argument that someone may be inclined to adjust, you know, their behavior, is purely speculative. There is no evidence of pre-trial contact or during a trial contact. The witness herself stated that the first contact was two weeks after the trial. The circuit court – But wouldn't he have been fighting much harder at the motion for a new trial? Wouldn't he have been fighting as hard if he weren't dating the victim? I don't believe that that contact impacted his advocacy during that trial. The trial was supported, as Justice Burkett mentioned earlier. The conviction was supported by facts, to include defendant's own confession that played a large part in him being found guilty. And so, no, it is not the state's position that the contact that he had with the witness severely impacted his advocacy during the motion for the new trial. And also the defendant mentioned, I believe in the opening brief, that the ASA's getting the order of protection against, you know, the defendant was an attempt to isolate the defendant away from the witness so he could, you know, But as we addressed, that is typical in domestic violence cases to advocate for order of protections in order to guarantee the safety of the victim. And if we were to allow that to be an inclination or a basis of possible underlying motives, there would be a slew of complaints coming before you all or the ARDC in those instances. You say that defendant doesn't provide any authority on appeal, that the standard is an appearance of impropriety. You made that statement in your brief. But they do cite Lange and Courtney, and both of those involve cases where convictions were reversed and new trials granted. Is that sufficient? We don't believe that that is sufficient. It is not the state's position that that is sufficient. The cases they cited, for example, Hutchinson, dealt with attorney discipline. Well, Hutchinson, let's set that over here, shall we? And let's just set it here because what I'm asking about is Lange and Courtney. Lange and Courtney we don't believe is sufficient as it pertains to the appearance of impropriety standard. Lange dealt with the appointment of special prosecution, one. In both those cases, there were motions for a special balloon, for a special prosecutor. I mean, that's what I see as the big difference is in both those cases, the court, the defendant, you know, you have the prosecutor looking behind the potted palm following the defendant out of the courthouse, and the defendant knew that that state's jury was going to be a witness against him for a subsequent DWLR. And they brought, in both those cases, Courtney and Lange, they said, we want a special because the prosecutor here is interested, you know, inappropriately interested. And in both cases, the motion for a special was denied. And in both cases, the appellate court reversed in bringing a new trial. And neither one of them, did they talk about prejudice? So I realize it's a different standard, but given that, the reason I entertain that as significant is that here, this defendant, he didn't know anything about this, so he couldn't have brought a motion for a special. And yet, you're arguing, well, that he can't avail himself of the relief that was given to Lange and Courtney, because here, he didn't know, and the posture of the matter is a new trial. Absolutely, I would like to address Lange. So Lange dealt with the old version of Section 9008, which stated that special prosecution appointment was proper when a state's attorney was interested in any cause or proceeding. After that, an amendment was made in 2016 that specifically eliminated that broad language and replaced it with a requirement for actual conflict of interest. That's a good point. And that was not a minor technical change. It was a deliberate legislative decision to raise the standard and eliminate appointment based on mere appearance of impropriety. And also, the cases, you know, including Courtney, as you mentioned. So that answers the motion for a special. It does. And I will say the state moved, filed a motion for special prosecution in an abundance of caution. And the defendant mentioned earlier that the state agreed to the new sentencing hearing because we knew that there was, you know, the actual conflict going on all the time. The state agreed because we knew that by the time the sentencing hearing had occurred, that contact had been made. So in abundance of caution, appoint the special prosecutor and grant him that to just remove the appearance. But it wasn't a concession. Sotomayor, how about prior to the motion for a new trial? Motion for, you know, the post-trial motions. Who argued the post-trial motion? The ASA, the original ASA might have. Should there not have been a special prosecutor arguing the post-trial motions? No. It's not the state's position that special prosecution. They were dating at that point. Contact had been made, you know, by that point. Yes, Justice Shostak. But based on the evidence that was presented that the state had offered through affidavit, it was just simply warranted by the time the sentencing hearing had occurred. And I'm sorry. I worded that wrong. I understand what you're saying. My apologies. No. But to also address the relief that the defendant got and the public confidence argument that that was made, the state is more than aware of the public confidence that should be had in our judicial process. And we are not, you know, throwing out a back burner. But the system worked as it intended when the misconduct was discovered by the office. The people immediately sought special prosecution, I mean special prosecutor to be appointed. They demonstrated the institutional commitment to ethics over case outcomes. The ASA faced serious professional consequences through the ARDC proceedings. And those responses showed the system's, you know, capacity for self-correction and accountability. Second, the defendants, you know, approached with damaged public confidence by making criminal convictions vulnerable to attack based on prosecutorial misconduct unrelated to trial fairness. And I think that's what we're dealing with here. We are not saying that, you know, the ASA did not make, you know, contact or that it made absolutely no difference at any point in the proceedings. But we're saying during the trial there was no evidence that there was a relationship or there was any impact. And where the facts supported the conviction, it does not warrant it being overturned. Plus no prejudice. No prejudice. And that is what is required here. The defendant, to briefly conclude, I don't know, my time is up. The defendant got all the relief and more than he was entitled to. We disclosed as soon as we found special prosecution. We did file a motion for special prosecution. It was appointed. We did agree to the new sentencing hearing because we knew that contact, you know, had been made and they had, you know, been in some type of, the ASA and the witness had, you know, some type of inaction by then. One quick question. The only reason that the prosecutor knew of that was because she filed suit, correct? I believe, based on my reading of the AIDC proceedings, that is what happened. So had she not done that, nobody would have ever known about this relationship. I can't speak to what, you know, the ASA's intentions would have been, you know, post. But she did, they did find out through the file of the order of protection about the relationship and they took immediate action at that point. Thank you. Any questions? Justice Meyer. Thank you so much. Thank you. Mr. Allen. Thank you, Your Honors. First, I just want to address when the relationship started. The state was saying that, you know, contact was made shortly after trial, but they weren't in a relationship before the motion for new trial and sentencing based on the record in this case. I want to direct you guys to C-175 of the record. It is the affidavit from J.N. And in number six, it states, quote, Mark Schliff and I had several discussions about criminal matters promising the assistance and even suggesting that I hire a certain person. This began in April of 2022, which was early in the sexual relationship with him. So the relationship had started in early April. How many weeks after the trial? The trial was March 16th. And the contact was made on March 30th. And then, according to the ARDC opinion, I believe the relationship started the 14th. The 14th of April? The 14th of April. And when is the first motion for new trial? The motion for new trial is in May of 2022. I don't know the specific date, though, of it. The hearing? Yeah, yeah. So the hearing, yeah, was a motion for new trial and a sentencing on the same date in May. So weeks after the sexual relationship had started. And I just wanted to address kind of what Justice Mullen mentioned earlier, kind of like, you know, was there, because I focused more on what happened at trial and how Schliff's actions had impacted the trial in kind of my briefing. But kind of under your framing of was there a conflict at the motion for new trial? Under Yost, there is a per se and an actual conflict. Because there is a, I'm going to stick with per se, because they were in a contemporaneous relationship on that day. And so that should not even require showing of prejudice. It doesn't require showing. And the same thing for the sentencing, which the state agreed to a new sentencing. You don't need to show how Mark Schliff's actions at that sentencing hearing impacted his sentence. Because we can't know if he would have gotten 60 days or 70 days, depending on how Schliff would have litigated that. But it also applies to the motion for new trial. And that occurred at the motion for new trial. Before his conviction was final. But I still believe that his trial, not just the motion for new trial was impacted, but also his trial because of the implication based on him waiting two weeks to pursue J.N. It strongly suggests that Mr. Schliff had that intent throughout pretrial prep, throughout his questioning, throughout all of that. During trial you're talking about? What? During trial. During trial I think it impacted. I don't think it clearly falls under Yost, like I just said, as to the per se conflict. But I still think there is, you know, it strongly suggests that his trial was impacted. And, you know, he should get a new trial where he is tried by a prosecutor who is not looking to pursue his ex-girlfriend romantically. May I ask, this is, are you familiar with People v. Hayes from the Fifth, where a defense attorney had a sexual relationship with a defendant? So it's not on all fours. They're predated. Yes, they're predated. It was contemporaneous with the representation. And the reason I bring it up is that the Fifth held, it's 2024 case, People v. Hayes from the Fifth. The Fifth held that was not per se. They said Yost, Supreme Court, is very, I'll use the word conservative. There's a narrow, you know, reading of what is a per se conflict. The Fifth said this isn't it. But they did go on and find an actual conflict and prejudice.  So is that helpful here? Does that help us at all? So I think the distinction for that is right. So all I kind of was addressing on the conflict angle was that there was a per se conflict in May, at the hearings in May, because that sexual relationship was contemporaneous. I mean, they started dating in May, and they didn't stop until March of the next year. Well, certainly his tactics or strategy in representing the State in this case, representing the victim, as Justice Burkett says, would attribute to a conflict is what your position is.  What fact or facts did Shlisko manipulate in order to secure a conviction? I mean, first, I don't think we can know. But I do think that we... Well, what's your gut feeling? What fact or fact did he manipulate? I mean, the... The defendant made a statement in the squad car that the court interpreted as a confession. Sure. And so I've listened to that statement countless numbers of times. And I can't hear that confession. That was extensively litigated. I mean, Shlisko was the first person at trial to say that Mr. Aguirre confessed in that video. The police officer didn't say it. You know, I haven't heard it yet. It was a heavily litigated case, and we don't know how aggressively he would have litigated it. He also, you know, when the defense counsel reflated at the motion for a new trial, he said he played the wrong part. Budget records showed he played the right part. So I think that is the key part, and we don't know how the court would have interpreted it if Mr. Shlisko was not the prosecutor arguing this case. If it was some line assistant, might it come out differently, you think? Just any person. I think everybody, you know, everybody argues a case differently. So we just don't know. Thank you. If there are no further questions. Let's see, is there any questions? No, thank you. Okay. This court should grant Mr. Aguirre a new trial because Shlisko's actions, pursuing Jay Adams initially after trial, tainted Mr. Aguirre's conviction and calls into question the fair administration of justice in this case. Thank you. Thank you, sir. I want to thank both counsel today for their intelligent arguments, very interesting. This case will be taken under consideration and we will render a decision in due course.